U.S DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

SEP 21 2010

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

GERALD D. COLBERT

versus

SONIC RESTAURANTS, INC. and
THEIR UNKNOWN INSURER

CIVIL NO. 09-1423
JUDGE TOM STAGG

## MEMORANDUM RULING

Before the court are two motions for summary judgment filed by the defendants in the above-captioned matter, Sonic Restaurants, Inc. ("Sonic") and Lexington Insurance Company, Inc. ("Lexington") (hereinafter occasionally referred to as "the defendants"). See Record Documents 18 and 23. For the reasons set forth below, both of the motions for summary judgment are **GRANTED**.

## I. BACKGROUND

A.  **Facts.**

On February 7, 2008, Gerald Colbert ("Colbert") drove to the Sonic Restaurant in Mansfield, Louisiana, to purchase a cup of coffee from the drive-thru. Colbert made a special request to the order taker at Sonic that Sonic add cream and artificial sweetener when preparing his coffee. However, on that date, the Sonic

employee handed Colbert his cup of coffee along with the cream and artificial sweetener to put in his coffee instead of adding it to his coffee before bringing it to him, as he had requested.[1]  After receiving his coffee, Colbert pulled forward, placed his car in park and removed his foot from the brake. While sitting in his car, Colbert placed his coffee on the console. After doing so, and while holding his cup of coffee with his right hand, Colbert used his left hand to remove the lid so that he could add the cream and sweetener. With his left hand he took off the lid. The hot coffee splashed on his right hand and caused an instantaneous reaction causing the coffee to be spilled into his lap. He contends that he sustained second-degree burns through his blue jeans in his groin area, stomach/abdomen area and thigh.

Colbert filed suit in state court against Sonic and its insurer, alleging that Sonic was negligent and failed to warn him and other customers of hot coffee, failed to keep its coffee at a proper temperature and failed to make sure its coffee cups were in a safe condition. See Record Document 1. Colbert further alleged that Sonic "knew or should have known that the cup was over filled with hot coffee and should have warned plaintiff and other customers of hot coffee cups" and that

---

[1] Colbert asserts that prior to February 7, 2008, whenever he purchased coffee from a restaurant, including Sonic, he would make a special request that the restaurant add cream and artificial sweetener when preparing his coffee and that restaurants, including Sonic, usually honored his request.

Sonic's "coffee was unreasonably dangerous." Id. Sonic and Lexington removed the case to this court on the basis of diversity jurisdiction and filed the instant motions for summary judgment, arguing that Colbert's claims should be dismissed. See Record Documents 18 and 23.

## II. ANALYSIS

A.  **Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004) (citations and

quotations omitted). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

**B.     The LPLA.**

In this diversity claim, Louisiana products liability law applies to Colbert's claims. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938). The Louisiana Products Liability Act ("LPLA") "establishes the exclusive theories of liability for manufacturers for damages caused by their products." La. R.S. 9:2800.52; Evans v. Ford Motor Co., 484 F.3d 329, 334-35 (5th Cir. 2007); Stahl, 283 F.3d at 261-62. Thus, Colbert may not recover from Sonic for damage caused by a product on the basis of any theory of liability not set forth in the LPLA.

In order to maintain a successful action under the LPLA, Colbert must establish: (1) that Sonic is a manufacturer of the product; (2) that his damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous"; and (4) that his damage arose from a reasonably anticipated use of the product by him. See La. R.S. 9:2800.54(A). Colbert may prove that the product is unreasonably dangerous in construction or composition, in design, because of an inadequate warning, or because it does not

conform to an express warranty of the manufacturer about the product. See La. R.S. 9:2800.54(B) and (D). "Defects are not presumed to be present by the mere occurrence of an accident." Spott v. Otis Elevator Co., 601 So.2d 1355, 1364 (La. 1992) (citation omitted). Colbert alleges that Sonic's coffee is "unreasonably dangerous" in construction or composition and because of an inadequate warning.

### 1. Construction Or Composition.

To prevail on a construction or composition defect claim under Louisiana law, Colbert must show that "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La. R.S. 9:2800.55. In other words, Colbert must prove that a product "is defective due to a mistake in the manufacturing process." Stahl, 283 F.3d at 263 (citing La. R.S. 9:2800.55).

Colbert bears the burden of proof on each of the elements of his claims. See La. R.S. 9:2800.54(D); Caboni v. Gen. Motors Corp., 398 F.3d 357, 361 (5th Cir. 2005). Thus, the defendants were not required to submit evidentiary documents to support their motions, but needed only point to the absence of evidence supporting Colbert's claims. See Latimer v. Smithkline & French Labs., 919 F.2d 301, 303 (5th Cir. 1990). Nevertheless, the defendants submitted the expert report of Daniel

5

Cox ("Cox"). The deposition of Cox revealed that Cox has twenty-nine years of experience in the coffee industry and that he has studied coffee temperature and brewing and holding and serving temperatures. See Record Document 54, Ex. A at 27. He has tested coffee, lectured about coffee industry standards, taught seminars about coffee industry standards, written articles about coffee industry standards, and owns and operates the largest industry testing lab in the United States. See id., Ex. A at 28-30. Cox testified in his deposition and in his report that the industry standard for serving coffee is 155 to 185 degrees. See id., Ex. A at 32 and Record Document 47, Ex. A. He stated that the proper temperature for brewing coffee is 200 degrees plus or minus 5 degrees because "[c]ooler temperatures fail to extract enough flavor compounds, resulting in weak tasting coffee, while excessively high temperatures result in bitter and astringent coffee." Record Document 47, Ex. A. The recommended brew holding temperature, which is the temperature at which coffee is maintained in a thermal vessel prior to being served, is 185 degrees to 190 degrees. See id. He opined that the "objective of a constant holding temperature is to be able to preserve coffee flavors, which are quite volatile." Id.

Cox further indicated that "[o]ther than routine cleaning, manufacturers of brewing equipment do not recommend allowing on site operators the ability to make

adjustments to their equipment." Id. Cox was also questioned by Colbert's counsel about the temperature of Sonic's coffee and how it is regulated:

> Q: And I can tell you that you've told me that you don't know the temperature of the coffee that -- on the day that Gerald Colbert was burned at Sonic. Now, my question is, if you don't know the temperature of the coffee that day that Gerald Colbert was burned, how can you candidly tell me and the Court that the coffee was within the industry standards temperaturewise?
>
> A: The way brewing equipment is configured today is that there are upper and lower thermostats on the equipment. If the equipment is -- if the temperature of the liquid coming out of the machine is too low, there is a thermostat which will not allow the machine to brew, and if the temperature is too hot, it will not allow this machine to brew. Since neither of those were indicated, I can -- I can say with probability that the machine was within the brewing temperatures, but as to whether -- the exact temperature on that day, I cannot say.

Record Document 54, Ex. A at 20-21. When asked whether the settings within the machine that Sonic uses would vary greatly from day to day, Cox responded, "No." Id., Ex. A at 50.

The defendants also submitted the affidavit of Billy Cotton ("Cotton"), who was the store manager for the Sonic in Mansfield. See Record Document 18, Ex. D. Cotton attested that to his knowledge, no one had checked the temperature of the coffee made at the Mansfield Sonic on February, 7, 2008, the date of the incident. However, Cotton stated that on February 8, 2008, "when asked to by a supervisor, [he] personally measured the temperature of the coffee at the Mansfield store" and

that the "temperature was at 169 degrees." Id. Cotton further explained that since then, he has performed "random sampling of the Sonic's coffee temperatures which have ranged from 169 degrees Fahrenheit to 170 degree Fahrenheit." Id.

Colbert, on the other hand, has failed to come forward with any *evidence*, expert or otherwise, to rebut Cox's opinions and create a genuine issue of material fact for trial. Instead, Colbert has simply submitted his own affidavit wherein he states the following:

> 16. That upon the Sonic cup of coffee spilling over him, he saw steam rising from the coffee and going through his car window, as if the steam was rising from boiling water. Furthermore, based on his experience of working at a paper mill and using steam at work, he knows that steam occurs at a very high temperature.
>
> 17. That he studied chemistry in high school. Based on his studies in high school, water boils and turns to steam at 212 degrees Fahrenheit.
>
> 18. That based on his studies in high school, and the rising steam he witnessed from the hot coffee spilled on him, he believes that the hot coffee that spilled on him was at least 212 degrees Fahrenheit.

Record Document 26, Ex. 1 at 3-4. Colbert's only other evidence is an affidavit of Calvin Boykins ("Boykins"), who stated that since 2008, he has purchased coffee at the Sonic in Mansfield and that "when he purchases coffee at the Sonic, he cannot drink his coffee because the coffee is too hot." Id., Ex. 4 at 1. Boykins further stated that "he has to wait for the coffee to cool down before he drinks the coffee" and that if he does not wait, "the coffee will scald and/or burn his mouth." Id., Ex.

4 at 2.²

Despite these two attempts to create a genuine issue of material fact, the record is devoid of any *evidence* whatsoever concerning whether the coffee was "unreasonably dangerous" as defined under the LPLA. As the Fifth Circuit has noted, Louisiana law does not allow a fact finder to presume a characteristic of a product is unreasonably dangerous solely from the fact that an injury occurred. See Grenier v. Med. Eng'g Corp., 243 F.3d 200, 205 (5th Cir. 2001).

A search of the jurisprudence has revealed surprisingly few cases regarding coffee spills and the LPLA. Therefore, a review of similar cases from other circuits was made to correctly determine the current state of jurisprudence on the subject.

In McMahon v. Bunn-O-Matic Corp., 150 F.3d 651 (7th Cir. 1998), the court, applying Indiana law, affirmed entry of summary judgment in favor of a manufacturer of a coffee machine regarding a burn victim's claim that coffee purchased by her was defective and unreasonably dangerous due to its excessive

---

²Colbert also attempts to create a genuine issue of material fact by referring to a statement that he alleges was made by an employee of Sonic. Colbert contends that Francechester Youngblood ("Youngblood") told him that she had "gotten burned by the water" and that the water is "too hot." Record Document 26, Ex. 1 at 4-5. Regardless of the hearsay implications, Youngblood was subsequently deposed and clearly refuted these allegations by stating that she did not get burned by Sonic's coffee or water used to make Sonic's coffee. See Record Document 47, Ex. B at 18-20.

temperature. The court stated that the plaintiff needed to prove that the design was defective and that the defective product was unreasonably dangerous, which under Indiana law was defined as "any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics common to the community of consumers." McMahon, 150 F.3d at 657 (citation omitted). The court questioned whether a third-degree burn was a harm beyond that contemplated by the ordinary consumer who knows that hot liquids burn. However, the court did not ultimately decide that issue, instead concluding that the 179 degree holding temperature of the coffeemaker was not a design defect.

In Greene v. Boddie-Noell Enterprises, Inc., 966 F.Supp. 416 (W.D. Va. 1997), the court, applying Virginia law, granted summary judgment in favor of a restaurant regarding an injured customer's product liability claim that the coffee served to the customer was dangerously defective due to its temperature. The court stated that to prove a case of liability, the plaintiff should prove that the product "had a defect which rendered it unreasonably dangerous for ordinary or foreseeable use," by presenting proof that the product "violated a prevailing safety standard whether the standard comes from business, government or reasonable consumer

expectation." Greene, 966 F.Supp. at 418. The court questioned whether other restaurants served coffee at lower temperatures or whether customers expected cooler, potentially less tasty coffee, and concluded that the plaintiff did not prove that heat of the coffee served by the restaurant violated any safety standard.

Finally, in Olliver v. Heavenly Bagels, Inc., 729 N.Y.S.2d 611 (N.Y. Sup. 2001), the court determined that coffee purchased by the plaintiff which caused second degree burns was not unreasonably hot. The record contained evidence that the temperature range recommended by the coffee industry for brewing coffee was a temperature that could cause second degree burns.

Colbert has not met his burden of proof as to his construction or composition claim. The defendants have introduced evidence indicating that the temperature of Sonic's coffee was within the accepted industry range. There is no evidence whatsoever that the coffee was "defective due to a mistake in the manufacturing process." Stahl v. Novartis Pharms. Corp., 283 F.3d 254, 263 (5th Cir. 2002) (citing La. R.S. 9:2800.55). The conclusory affidavits submitted by Colbert are simply insufficient to demonstrate the existence of a genuine issue of material fact as to whether the coffee was unreasonably dangerous in construction or composition. See Grenier v. Med. Eng'g Corp., 99 F.Supp.2d 759, 764 (W.D. La. 2000), aff'd 243 F.3d 200 (wherein the district court dismissed the plaintiff's claim

11

for a construction defect because the plaintiffs failed to submit any evidence indicating what the manufacturer's standards were or whether the product deviated from those standards). Consequently, this court finds that "there has been a 'complete failure of proof concerning an essential element'" of Colbert's claim. Stahl, 283 F.3d at 263 (quoting Celotex, 477 U.S. at 323, 106 S. Ct. at 2552).

### 2.   Inadequate Warning.

To maintain a failure to warn or inadequate warning claim under the LPLA, Colbert must prove that, at the time the product left the manufacturer's control, "the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its dangers to users and handlers of the product." Stahl, 283 F.3d at 261 (quoting La. R.S. 9:2800.57). Pursuant to Louisiana Revised Statute 9:2800.57(B), a manufacturer's duty to warn does not extend to dangers that are or should be obvious or common knowledge to the ordinary user or handler of the product.[3] See

---

[3] Section 2800.57(B) states:

A manufacturer is not required to provide an adequate warning about his product when:

(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's

Ballam v. Seibels Bruce Ins. Co., 712 So.2d 543, 550 (La. App. 4th Cir. 1998); Mallery v. Int'l Harvester Co., 690 So.2d 765, 768 (La. App. 3d Cir. 1996). This rule "is particularly so when the user is familiar with the product, making him a 'sophisticated user.'" Ballam, 712 So.2d at 550 (citation omitted). "To be relieved of the duty to warn, the manufacturer need not show that the user had actual knowledge of the danger," but rather "need show only that the user should have known of the danger." Mallery, 690 So.2d at 768 (citations omitted).[4] Moreover, Louisiana courts have presumed that "sophisticated users" know about the danger because of their familiarity with the product. See id. (citations omitted); see also LaSalle v. Wilson Trailer Co., 787 So.2d 1173, 1178-79 (La. App. 3d Cir. 2001); Morgan v. Gaylord Container Corp., 30 F.3d 586, 591 (5th Cir. 1994); Gautreaux v. Tex-Steam Co., 723 F.Supp. 1181, 1182-83 (E.D. La. 1989).

---

        characteristics; or

        (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

La. R.S. 9:2800.57(B).

[4]The Fifth Circuit has rejected the notion that a claim of inadequate warning always presents a jury issue. See Anderson v. McNeilab, Inc., 831 F.2d 92, 93 (5th Cir. 1987). A "mere allegation of inadequacy" is insufficient for Colbert to survive summary judgment on his failure to warn claim. Id.

The summary judgment evidence in this case clearly classifies Colbert as a sophisticated user of Sonic's coffee. Colbert testified during his deposition that he is a regular coffee consumer and that he has purchased coffee from Sonic numerous times prior to the incident. See Record Document 18, Ex. A at 28-30. In fact, Colbert admitted during his deposition that he has previously spilled hot coffee on himself. See id., Ex. A at 72. Based on this evidence in the record, this court concludes that Colbert was a sophisticated user of Sonic's coffee (and coffee in general) and, in light of his experience and common sense knowledge, he should have known of the dangers inherent in drinking hot coffee. Colbert should have known the risks associated with opening the lid of a hot coffee cup in an automobile. This hazard was open and obvious to a sophisticated user with his years of experience drinking coffee. In a case such as this, additional warnings, including those advocated by Colbert, would have only provided "a sophisticated [user] with information which was already common knowledge among [users] and with information he [was] presumed to know." Mallery, 690 So.2d at 768. As a matter of law, the defendants had no duty to provide additional warnings to a coffee drinker such as Colbert, who was familiar with the product and with the potential hazards arising from its use. The record clearly evinces that Colbert was an experienced coffee drinker who knew that coffee was expected to be hot.

14

Colbert contends that he should be considered a "special request customer," as he requested that Sonic put the cream and artificial sweetener in the cup for him. Therefore, Colbert concludes that he is not an "ordinary coffee consumer." See Record Document 26 at 9. This contention, however, only illustrates that Colbert knew, or certainly should have known, of the potential dangers in drinking hot coffee when he purchased the coffee from Sonic. In addition, as previously mentioned, Colbert admitted that he had spilled coffee on himself in the past. The earlier incident should have put Colbert on notice of the danger of drinking hot coffee. See Davis v. Avondale Indus. Inc., 975 F.2d 169, 173 (5th Cir. 1992) (manufacturer has no duty to warn employee of user that has knowledge of danger); Grenier v. Med. Eng'g Corp., 243 F.3d 200, 205 (5th Cir. 2001) (noting that "manufacturers have no duty to warn of dangers that are obvious to ordinary users").

A Louisiana case addressing the issue of failure to warn involving a hot beverage was decided in 1998. In the case of Oubre v. E-Z Serve Corp., 713 So.2d 818 (La. App. 5th Cir. 1998), the Louisiana Fifth Circuit Court of Appeal addressed the issue of whether a vendor has a duty to warn consumers of the extreme heat of beverages served by the vendor. The court held that no such duty arose absent evidence that the beverage sold exceeded industry standards or was hotter than

15

normal. The court recognized that a vendor has a duty to warn a consumer about the temperature of a beverage only if it exceeds the reasonable range of temperature for such a product. In this regard, the court found that the consumer failed to produce any evidence that the coffee exceeded the accepted industry standard or that it was "supercharged, superhot, or hotter than normal." Id. at 822. The court also noted that the consumer was a frequent coffee drinker, that the consumer had purchased coffee from the vendor previously and that the consumer continued to purchase coffee from the vendor after the accident. Thus, the court concluded that there was no evidence to support a finding of liability on the part of the vendor for failure to warn of the temperature of the coffee purchased by the consumer.

In this case, as in Oubre, Colbert was a frequent coffee drinker and had purchased coffee from Sonic previously. Additionally, there is no evidence that Colbert's coffee exceeded the accepted industry standard or that it was "supercharged, superhot, or hotter than normal." Oubre, 713 So.2d at 822. To the contrary, the currently undisputed evidence before the court indicates the opposite. Thus, as in Oubre, this court finds that there is no evidence to support a finding of liability on the part of the defendants for failure to warn of the temperature of the coffee purchased by Colbert.

## C. Negligence Under State Law.

The LPLA provides "the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. 9:2800.52. The LPLA sets forth four exclusive theories of recovery against a manufacturer: (1) defect in construction or composition, (2) defect in design, (3) inadequate warning or (4) failure to comply with an express warranty. La. R.S. 9:2800.54(B)(1-4). Louisiana courts have "held the LPLA subsumes all possible causes of action, with the exception of a claim in redhibition." Touro Infirmary v. Sizeler Architects, 947 So.2d 740, 744 (La. App. 4th Cir. 2006). Federal courts applying Louisiana law have also employed this principle. See Bezet v. Smith & Wesson Corp., No. 08-685, 2009 WL 632080 (M.D. La. Mar. 11, 2009); Borskey v. Medtronics, No. 94-2302, 1998 WL 122602, at *4 (E.D. La. Mar. 18, 1998). "While the statutory ways of establishing that a product is unreasonably dangerous are predicated on principles of strict liability, negligence, or warranty, respectively, neither negligence, strict liability, nor breach of express warranty is any longer viable as an independent theory of recovery against a manufacturer." Jefferson v. Lead Indus. Ass'n, 106 F.3d 1245, 1251 (5th Cir. 1997) (incorporating district court opinion dismissing plaintiff's claims, 930 F.Supp. 241 (E.D. La. May 31, 1996) (Vance, J.)). However, while the LPLA's exclusivity provision eliminates a *general* negligence cause of action for damages caused by a

product, "it does not eliminate the liability of a manufacturer for damages caused by the negligent use of its product by one of its employees." Lavergne v. America's Pizza Co., 838 So.2d 845, 848 (La. App. 3d Cir. 2003); see also Crawford v. Dehl, No. 08-0462, 2008 WL 4186863 (W.D. La. July 21, 2008).

The fundamental principle of tort liability in Louisiana is that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315. In a negligence action under article 2315, the plaintiff bears the burden of proving fault, causation and damages. See Wainwright v. Fontenot, 774 So.2d 70, 74 (La. 2000) (citing Buckley v. Exxon Corp., 390 So.2d 512, 514 (La. 1980)). Under Louisiana jurisprudence, state courts have adopted a duty/risk analysis test in determining whether liability exists. See Brewer v. J.B. Hunt Transp., Inc., 35 So.3d 230, 241 (La. 2010). Under the duty/risk analysis, Colbert must prove five elements: (1) Sonic had a duty to conform its conduct to a specific standard of care, (2) Sonic failed to conform its conduct to the appropriate standard of care, (3) Sonic's substandard conduct was a cause-in-fact of his injuries, (4) Sonic's substandard conduct was a legal cause of his injuries and (5) actual damages. See id. (citing Pinsonneault v. Merchs. & Farmers Bank &

Trust Co., 816 So.2d 270, 275-76 (La. 2002)).[5]

Colbert contends that a Sonic employee negligently overfilled his coffee cup with hot coffee. This is a viable claim outside of the LPLA. The defendants contend that "there is insufficient evidence to satisfy causation [sic] Plaintiff cannot show that Sonic overfilling the coffee cup caused plaintiff to spill the coffee on himself that resulted in his injury." Record Document 20 at 13. The defendants also deny that the coffee cup was overfilled since a lid was secured over the coffee. See id. Finally, the defendants assert that Colbert's injuries are insufficient to prove negligence, citing Oubre, 713 So.2d 818. See id. The defendants' best argument is derived from their conclusion that "there is no factual basis for a conclusion that Sonic's coffee was negligently served because evidence of burns alone does not establish that the coffee at issue exceeded acceptable temperatures." Id. at 14.[6]

Based on the evidence before the court, Sonic did not breach a duty to Colbert.

---

[5]Notably, the defendants fail to conduct in any manner a duty/risk analysis. The entirety of their argument as to Colbert's negligence claim is contained in a little more than a page. See Record Document 20 at 13-14.

[6]Colbert counters the defendants' arguments by citing to a statement made by Sonic employee, Youngblood, in her deposition. When asked whether she had ever heard of anyone saying anything about Sonic's coffee cups being overfilled, Youngblood responded that she had "heard it from a couple clients." Record Document 47, Ex. B at 13. Youngblood also stated that "a couple clients say some of them have had them fill them too full." Id.

19

As previously discussed, Colbert has failed to prove that Sonic served coffee at a temperature that exceeded the industry norm. Even if the coffee cup was overfilled, which is questionable in light of Colbert's admission that a lid was on the cup of coffee he received, the court has determined that the temperature of the coffee was not unreasonable. Accordingly, Colbert's negligence claim should be dismissed.

### III. CONCLUSION

Based on the foregoing, Colbert's claims against Sonic and Lexington do not pass muster. Accordingly, the motions for summary judgment filed by Sonic and Lexington are **GRANTED** and all claims made by Colbert against Sonic and Lexington are **DISMISSED WITH PREJUDICE.**

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this 21st day of September, 2010.

_____
JUDGE TOM STAGG